❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>9855 West Hawthorne Road<br>Mequon, Wisconsin  53097 | )<br>)<br>)<br>)<br>)<br>)    Case No.  22-852M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location):*

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attaachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____March 9, 2022_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.  ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Nancy Joseph_____.
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*  ❏ until, the facts justifying, the later specific date of _____.

Date and time issued:  02/23/2022 9:46 am _____

_____
*Judge's signature*

City and state:  Milwaukee, WI _____

Honorable Nancy Joseph
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.:<br>  22-852M(NJ) | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

Description of:        Kay Yang Residence
                       9855 West Hawthorne Road
                       Mequon, Wisconsin  53097

    This is a personal residence located just south of West Hawthorne Road on a private driveway.  The residence is identified with the numbers "9855" etched in a wooden mailbox post located on West Hawthorne Road.   The home is a two-story residence with red brick as the exterior walls.   The residence also includes an attached 4 car garage.



A-1

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.      All records relating to violations of Title 18, United States Code, Sections, Sections 1343, 1956, 1957, those violations involving Kay Yang, AK Equity Group LLC, AK Global Investing LLC, Xapphire Fund LLC, Xapphire G Fund LLC and Xapphire LLC and occurring after January 1, 2016, including:

      a.  ledgers, journals, subsidiary ledgers, financial statements, gross receipts and income records, cash receipts and disbursements records and/or journals, sales and purchase records and/or journals, accounts receivable and payable ledgers and records, bad debt records, cost of goods sold records, loan receivable and payable ledgers, voucher register and all sales and expense invoices including all invoices documenting expenses paid in cash or bank checks and retained copies of any bank checks, and any other handwritten summaries/notes or schedules;

      b.  personal and business financial records reflecting income and expenses including: state and federal tax returns, bank statements, records reflecting dates and amounts of deposits, deposit slips, records reflecting dates and amounts of withdrawals, withdrawal slips, debit and credit memos, records reflecting the identity of checks deposited, records disclosing the disposition of withdrawals, check registers, checks and deposit tickets including cash deposits, certificates of deposit, money market certificates,  cancelled checks (front and back), check stubs, money orders and receipts, cashier's checks, travelers checks, wire transfers, records reflecting the transfer of funds, bank notices, trust account records, brokerage account records, signature cards, foreign bank records, and any other records relating to bank accounts;

      c.  business origination and creation documents;

      d.  titles to assets, real estate records, foreign real estate and other assets, travel and vacation records, IRA and 401K records, stocks and bonds records, insurance records, passbooks, gambling records, trust records, and other investment records;

      e.  documents and items evidencing the obtaining, secreting, transfer, and/or concealment of assets and expenditure of money;

      f.  records of off-site storage locations, including but not limited to safe deposit boxes, keys and records, and records of storage facilities such as receipts, keys, and rental agreements;

g.  client records including names, addresses, notes, transaction records including subsidiary ledgers, schedules, summaries, and other financial statements identifying clients;

h.  personal identification documents;

i.  All cash amounts in excess of $1,500, currency, financial instruments, and

j.  computers or storage media used as a means to commit the violations described above.

2.  For any computer or storage medium the seizure of which is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

B-2

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment; and

n.  records in any format or medium that describe or refer to online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

3.  Routers, modems, and network equipment used to connect computers to the Internet.

## Definitions of Key Terms

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

B-3

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

# UNITED STATES DISTRICT COURT

### for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 22___852M (NJ) |
| 9855 West Hawthorne Road Mequon, Wisconsin 53097 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1956 and 1957 | Money Laundering |
| 18 U.S.C. 1343 | Wire Fraud |

The application is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Park Jones, Special Agent, IRS
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone _____ *(specify reliable electronic means).*

Date: 2/23/22

_____
*Judge's signature*

Honorable Nancy Joseph, Magistrate Judge
*Printed name and title*

City and state:  Milwaukee, WI

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Park Jones, being first duly sworn on oath, do hereby depose and say:

1. I am employed as a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI), and have been so employed since September 2005.  My responsibilities as a Special Agent include the investigation of potential criminal violations of the Internal Revenue Code under Title 26 of the United States Code, as well as related Title 18 and Title 31 offenses.

2. As a Special Agent, your affiant has personally conducted or assisted in numerous investigations of alleged criminal violations of Internal Revenue laws, money laundering, and other financial crimes such wire fraud and mail fraud.  I have participated in the execution of numerous search and seizure warrants. These warrants have included the search of businesses and residences of individuals involved with fraudulent schemes involving money laundering and tax evasion. I have also received additional specialized training in tax fraud, money laundering and asset forfeiture.  In addition, your affiant is licensed as a Certified Public Accountant (CPA) in the State of Wisconsin and has been licensed since 2003.

3. Based on my training and experience I know that individuals involved in both legal and illegal financial activities maintain books and records of some kind (i.e. either formal or informal and paper and electronic).  These records include notebooks, payment ledgers, bank statements, and records showing the receipt and disposition of funds.  Records of this type are normally kept for extended periods of time, are portable, and routinely stored in places that are secure but easily accessible, such as the individual's personal residence, an associate's residence, personal vehicles, or a business location.

4. Based on my training and experience I know that individuals who have sole control of a business also have control over the bookkeeping and record keeping for that business and have the opportunity to circumvent internal controls in order to divert funds for their personal use. The funds are often used for personal living expenses or accumulation of personal assets.

1

5.     The facts set forth in this affidavit are based on my personal knowledge; documents and records I have reviewed in the course of this investigation; information I have gained through my law enforcement training and experience; and information I have obtained from others, including other law enforcement officers and witnesses, all of whom I believe to be truthful and reliable.

**Purpose of Affidavit**

6.     Based on the totality of the facts contained in this affidavit, I submit there exists probable cause to search the residence of Kay Yang ("Yang") located at 9855 West Hawthorne Road, Mequon, Wisconsin, and described in detail in Attachment A.

7.     Based on the information contained herein, I submit there is probable cause to believe evidence of violations of the federal wire fraud and money laundering statutes will be found at 9855 West Hawthorne Road, Mequon, Wisconsin, described in detail in attachment B.

**The Offenses**

8.     There is reasonable cause to believe, based upon information believed to be reliable, that Yang has committed violations of Title 18, United States Code, Sections 1956 (money laundering), 1957, and 1343 (wire fraud).

9.     The federal wire fraud statute, 18 U.S.C. § 1343, provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, shall be [sentenced as provided in this statute.]

10.     One of the principal federal money laundering statutes, 18 U.S.C. § 1956, provides in pertinent part:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts, or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified lawful activity; or . . . to conceal or

2

disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced [as provided in this statute.]

11.     Another of the principal federal money laundering statutes, 18 U.S.C. § 1957, provides in pertinent part:

 Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in [this statute.]

12.     Evidence gathered to date suggests that Yang has devised and has been executing an investment fraud scheme that involves trading in foreign currencies and that has the characteristics of a Ponzi scheme.

13.     I know from my training and experience, and from my discussions with other experienced fraud investigators, that typical investment fraud schemes are characterized by offers of low- or no-risk investments, guaranteed returns, overly consistent returns, complex strategies, or unregistered securities.  These schemes often seek to victimize affinity groups to utilize the common interests to build trust to effectively operate the investment fraud against them. The perpetrators include professional investment advisers, as well as persons whom the victims trust and interact with daily.  The fraudster's ability to foster trust makes these schemes so successful.  Examples of investment fraud include advance fee fraud, Ponzi schemes, pyramid schemes, and market manipulation fraud.

14.     Based on my training and experience, a Ponzi scheme typically involves a seemingly legitimate business that purports to offer an investment or other financial instrument but actually derives the bulk of its revenue not from the investment activity but from recruiting new participants to pay into the system.  The hallmark of these schemes is typically a promise of substantial returns in a short period of time for doing little beyond paying into the organization and convincing others to do the same.

15.     People operating Ponzi schemes often go to great lengths to layer the program with jargon, procedural complexities, a formalized hierarchy of participation, and other trappings that create

3

the appearance of a legitimate company pursuing a (legal) multi-level marketing program – except that the organizers simply take in money from newly invested participants and use those funds to pay the returns promised to earlier participants.

16. Ponzi schemes are ultimately unsustainable because the returns promised to an ever-growing number of participants must be paid using funds deposited by a necessarily finite pool of new participants. At some point the scheme must become too big, that is, it must run out of new participants depositing sufficient cash to cover commitments to earlier participants and, because the underlying product is not in fact profitable, most of the scheme's participants lose their money.

17. Foreign exchange trading is an extremely risky type of investing that involves speculating in foreign currency by using the currency of one country to purchase the currency of another. Foreign exchange trading is essentially the trading of two countries' respective currencies against one another. The currency pairs are predetermined by brokers, who may or may not offer any particular currency pair for trade. For example, a popular pair that is widely traded is the Euro ("EUR") against the United States Dollar ("USD"). In the EUR/USD pairing, when the Euro becomes worth more money in dollars, the pair's value goes up; and when the Euro's value in dollars declines, the pair drops in value.

18. In this case, records gathered to date show that between 2017 and the date of this affidavit, Yang received investment funds in excess of $15 million from investors throughout the United States. Yang solicited these investments under the materially false pretense that she would invest the funds in international markets and foreign exchange trading for profit.

**Background**

19. Yang is a founder of and the CEO of both AK Equity Group LLC and Xapphire Fund LLC. She also has, at times, engaged in the tax return preparation business.

20. AK Equity Group LLC ("AK Equity") is a limited liability company organized under the laws of the State of Delaware effective March 28, 2017, with a business address of 1017 W. Glen Oaks

Lane, Suite 105, Mequon Wisconsin.  This was a previous office location for Yang.  However, Yang no longer occupies this office space.

21.     According to an investor presentation document, AK Equity is a fund management company that provides a comprehensive suite of investment solutions across geographies, asset classes and investment styles to clients.  The document lists the capital allocation for investor funds less than $5 million as 100% Forex or foreign exchange trading.   Yang also provided her education and professional background in the document as follows:

> Kay Yang is a registered agent of the IRS. Kay graduated with magna cum laude with BS in Management, received an MBA from Keller Graduate school of Management in Project Management and attended a prestigious university with a focus in Doctorate of Psychology. Kay brings her experience in business management, financial, tax, audit, and accounting. Kay serviced many of the fortune 500 companies as part of her role as Service Management, SAP Proposal and Project Architecture at Accenture LLP and managed financial and tax audits closely with the US Internal Revenue Service through TAX TYME as Administrator. Ms. Yang now serves as CEO at AK Equity Group LLC, a fund management company for the AK brands. Kay has created an exclusive network of family and friends to raise capital for investment purposes and has succeeded in raising $10M+[million] USO for AK Group since 2017. Her objective in 2019 is to manage over 100M+ in AUM [Assets Under Management].

22.     On December 19, 2018, Xapphire LLC and Xapphire Fund LLC, limited liability companies, were organized under the laws of the State of Delaware, with a business address of 1017 W. Glen Oaks Lane, Suite 105, Mequon Wisconsin.  The two members of Xapphire LLC and Xapphire Fund LLC are Yang and her brother, Cheng Xiong.  The operating agreement for Xapphire Fund LLC states that the company is engaging in the investment business and any and all activities permitted to be performed by the LLC.

## Investor Interviews

### *Investor 1*

23.     Investor 1 was interviewed by investigating agents on September 30, 2020, and August 18, 2021.  Investor 1 met Yang in connection with Yang's tax preparation business, during the preparation of Investor 1's tax returns. While she was preparing Investor 1's tax returns, Yang would see

5

large balances in Investor 1's bank accounts which started a discussion about investing. Yang told Investor 1 that she makes "good" money buying and selling stocks and could make Investor 1 "good" money if Investor 1 invested with Yang. Investor 1 invested $250,000 with Yang in January 2019 and, according to statements that he received, the investment balance grew to over $800,000 by the end of 2019. Investor 1 was not provided with any details regarding how his money was invested or how his investment grew to over $800,000. Investor 1 provided a copy of a statement he received for the period January 1, 2019, thru December 31, 2019. The ending net equity on the statement as of December 31, 2019, is $809,225. The statement provides limited information about the investment activity. The statement only shows the following items: Beginning Net Equity (i.e., the opening balance for the period), Equity Transactions (i.e. contributions or withdrawals), Net Increase or Decrease (i.e. the investment performance for the period), Ending Net Equity (i.e. ending balance for the period), and rate of return. The information on the statement appears to be created from an excel spreadsheet. The statement contains no information on how the funds were invested (i.e. stocks, bonds, mutual funds, foreign exchanges, etc..) and there is no detail regarding how the investment performance for the year was computed. Investor 1 learned of a Wisconsin Department of Financial Institutions ("WIDFI") investigation into Yang in August 2020. Investor 1 immediately asked Yang to withdraw $290,000 of Investor 1's funds from the investment account. Between August 2020 and March 2021, Investor 1 attempted to contact Yang on least 100 occasions by phone. Yang did not respond to any of these phone calls. Yang has not returned any of Investor 1's investment funds.

*Investor 2*

24.     Investor 2 was interviewed on October 5, 2020. Investor 2 met Yang at her residence at 9855 West Hawthorne Road, Mequon, Wisconsin, in late 2018 or early 2019 to discuss investment opportunities. Investor 2's husband, Investor 2's brother, and Yang's husband, Chao, were also at the meeting. At the meeting, Investor 2 received a packet containing information about AK Equity.

Investor 2 understood the investment involved foreign exchange trading. Yang told Investor 2 that, based on Yang's history of trading, Investor 2 could expect to double Investor 2's money.

25.     Between February 2019 and June 2019, Investor 2 invested a total of $960,000 with Yang. Investor 2 reviewed the investment performance from an online website Yang provided Investor 2 with access. Investor 2 recalled the first month of the investment earned $131,000 based off the online statement the Investor 2 was able to access. The original website Investor 2 accessed provided very detailed statements that documented each trade and all activity in the account. Investor 2 stated there has been 3 different iterations of the website and each time the website migrated to a new website address. The documents from the previous website were no longer accessible. The newest website only showed profits on a quarterly basis with no other detail.

26.     Investor 2 first started to become suspicious when the online statements had incorrect balances and the statements were becoming less and less detailed as the websites changed. Yang attributed the mistakes to bugs that were being worked out and would never answer any of Investor 2's questions directly about the website changes.

27.     After the WIDFI investigation was made public in July 2020, Investor 2 asked Yang to withdraw $1 million from Investor 2's account. Investor 2 has spoken with Yang repeatedly about this withdrawal. Yang has told Investor 2 several different reasons as to why the withdrawal has not been funded. These include:

- All payments to investors have to be presented to her attorneys and the state regulators due to the DFI order.

- Issues with the fund administrator causing a delay processing the withdrawal.

- Issue with the brokerage firm in London as a result of an ongoing audit. According to Yang, the audit had been preventing them from withdrawing funds, but investors are still able to trade.

- Yang stated all of the investments were at the time in a negative position and that, if a position is closed out, the investor will lose a lot of money.

7

28.     Investor 2 has not received any funds from Yang since her request in July 2020.

*Investor 3*

29.     On September 25, 2021, your affiant interviewed Investor 3.   Investor 3 met with Yang

and other investors at Yang's residence at 9855 Hawthorne Road, Mequon, Wisconsin, in October 2019.

The purpose of the meeting was to discuss Yang's investment opportunity.  At the meeting, Yang had

Investor 3 complete an Investor Profile Form and Form W-9 Request for Taxpayer Identification

Number and Certification.  The Investor Profile Form was 3 pages and requested name, date of birth,

social security number, address and banking information.  Yang also provided Investor 3 with a

Subscription Booklet for Xapphire Fund LLC.  Yang discussed the Subscription Booklet with Investor 3

and the others.  Investor 3 stated, according to Yang, the investment involved foreign exchange trading.

Yang never told Investor 3 about the risks associated with foreign exchange trading.  Yang told Investor

3, "don't worry everything will be fine."

30.     A few days after the meeting with Yang, and based on the information that Yang had

provided at that meeting, Investor 3 decided to do a joint investment with another investor.  Investor 3's

portion of the investment was initially $125,000.  Investor 3 provided Yang with a cashier's check for

the funds.  Investor 3 contributed another $125,000 on March 20, 2020.  The second investment was

done by a wire transfer.  Yang had Investor 3 send the wire transfer to an account at Equity Bank and

Trust Bahamas located in West Bay Nassau, Bahamas.  The wire transfer instructions had the following

information in the additional instructions section "Xapphire Global Investments Limited – 48850."

31.     During the interview with investigating agents, Investor 3 showed agents the website

used to login to view Investor 3's investment performance.  The last balance posted on the website is on

June 1, 2021, in the amount of $611,018.03.

32.     Investor 3 has attempted to contact Yang by phone and text several times since August

2021.  Yang has not responded to Investor 3.

33.     Investor 4 was interviewed on October 15, 2021.  Investor 4 heard about Yang's investment opportunity from a relative who had invested with Yang.  The relative had told Investor 4 the investment was performing very well.   Investor 4 first met with Yang on December 17, 2019.  Yang met with Investor 4 and nine other individuals at Investor 4's office.  Yang's husband, Chao Yang, was also present at the meeting.  Yang did most of the talking during the meeting.   Yang showed Investor 4 and the other investors a document labeled "Xapphire" and presented an investment opportunity that involved trading in foreign exchange currencies.  Yang stated there was risk to trading in foreign currencies but not to worry as she had experienced traders in Asia and Europe.   Yang told the investors the minimum investment amount was $250,000.  Yang further added that she needed to receive the investment by end of the February 2020 because the minimum amount of investment was increasing to $500,000 on March 1, 2020.  In addition, Yang told the investors the investment could not be withdrawn for one year.

34.     Investor 4 and the other investors wired a total $390,000 to Yang from January 27, 2020, to February 14, 2020.  Investor 4 initially received paper statements from February 2020 to November 2020 showing the investment performance.  After November 2020, Yang told Investor 4 she was changing fund managers and Investor 4 was given access to a website to use to check the investment performance.  Investor 4 showed agents the website during the interview on October 15, 2021.  The website format is identical to the website Investor 3 accessed.  Investor 4 stated the investment balance of $713,505.24 has not changed since June 1, 2021.

35.     In May 2021, Investor 4 requested a $100,000 withdrawal from Yang.  Investor 4 has asked Yang on several occasions about the status of this request.  Yang's response is always to tell Investor 4 to be patient and that Yang's finance team is working on the request.   During the week of

October 4, 2021, Investor 4 texted Yang for an update on the withdrawal.  Yang stated the funds would be available on October 11, 2021.  Investor 4 has never received the funds.

*Investor 5*

36.     On November 23, 2021, Investor 5 was interviewed.  Investor 5 heard about Yang's investment opportunity in the summer of 2019 from a family relative.  Investor 5 met with Yang in October 2019 at the same meeting with Investor 3 described above.   Investor 5 provided agents with a photograph of the individuals at the meeting with included Yang, Chao Yang, Yang's sister – Ger Xiong and four other investors.   Yang did all the communicating during the meeting.  Investor 5 recalled Yang presenting an investment in a private banking contract during the meeting.

37.     Investor 5 decided to do a joint investment with another investor. Investor 5's initial investment was $85,000.  Investor 5 hand delivered Yang a cashier's checks in the amount of $85,000 and made payable to Xapphire at her residence in Mequon, Wisconsin in late October 2019 or early November 2019.     Yang provided login credentials for Investor 5 to review the investment performance from a website.  Investor 5 checked the investment performance regularly using the website.  Investor 5 provided agents with screenshots of the website. The screenshot was identical to the website Investor 3 and 4 had used.   Investor 5 printed the investment balance as of November 30, 2021, which showed $520,989.83.

38.     In June 2021, Investor 5 asked to make a withdrawal of $60,000 from the investment account.   After several contacts with Kay Yang over the next several weeks, Kay Yang did send Yang money.  Investor's family in Thailand received $60,000 from Kay Yang.

39.     In October 2021, Investor 5's spouse asked to close their entire account.  Yang never responded to the request.

40.     On Friday, December 3, 2021, Investor 5 and his/her spouse met with Yang at a grocery store in Milwaukee, Wisconsin.  Yang told Investor 5 and spouse if they have discussions with others

about not being able to withdrawal their funds, Yang will have her attorney get involved. Later in the meeting, Yang contacted an individual whom she claimed was an attorney and placed the individual on speaker phone. The individual tried to reassure Investor 5 that Yang had funds to distribute but is having difficultly accessing the funds. The meeting was recorded by Investor 5's spouse. Investor 5 has not received any additional funds from Yang.

## Analysis of Bank Records

### *Capital One x4123*

41.     On July 31, 2017, Yang opened business bank account x4123 with the name of AK Equity Group LLC at Capital One Bank. The authorized signors on both accounts were Yang and Chao Yang (Kay Yang's husband).

42.     An analysis of the deposits and withdrawals in account x4123 was conducted. From September 2017 to December 2019, the investor deposits to this account totaled approximately $13.1 million. The investor funds received per year are as follows:

- 2017 - $1.777 million
- 2018 - $6.126 million
- 2019 - $5.234 million

43.     In performing an analysis of the withdrawals from the account, it appears that only a portion of the investor funds received were used for investment purposes. Instead, the investor funds were used to pay other investors, to pay expenses of the business and to pay for Yang's personal expenses. The table below is summary of the withdrawals occurring in account x4123 by year:

|  | **2017** | **2018** | **2019** |
|---|---|---|---|
| Funds used for Trading | $ 800,000 | $ 1,750,000 | $ 3,364,941 |
| Payments made to Investors | 109,829 | 648,178 | 1,222,910 |
| Casino Expenses [1] | 61,969 | 198,074 | 46,124 |
| Net transfers to Yang Personal Bank Accounts [1] | 191,000 | 2,061,292 | 399,805 |
| Other Expenses- Business and Personal[2][1] | 233,404 | 841,958 | 607,162 |

11

|  | $ | 1,396,202 | $ | 5,499,502 | $ | 5,640,942 |

(1)- See section "Yang's Use of Investor Funds for Personal Use"

(2)-The category Other Expenses has expenses that appear to be related to the operation of AK Equity and personal expenses of Yang. The business expenses are for payroll, information technology services and other miscellaneous expenses of the business. The personal expenses consist of travel and credit card payments.

44.     In February 2020, the AK Equity Group LLC account x4123 at Capital One Bank was closed.

*Equity Bank and Trust Bahamas x8580 and x8850*

45.     On or about October 2, 2019, Yang opened an account x8580 at Equity Bank and Trust Bahamas Limited ("Equity Bank") in the name Xapphire G Fund Limited. This bank is located in Nassau, Bahamas with no locations or affiliate locations in the United States. The account opening documents contained a "Confidential Private Placement Memorandum for Xapphire G Fund Limited." The document was dated August 26, 2019. The document described Xapphire G Fund Limited ("The Fund") as an open-ended investment fund incorporated in the Commonwealth of Bahamas. The Fund's registered office is at 201 Church Street, Sandyport, West Bay Street, P.O. Box N-3406, Nassau, Bahamas. Yang is listed as a member of the Board of Directors in the document.

46.     On or about December 5, 2019, Yang opened a second account x8850 at Equity Bank. The account was open in the name of Xapphire Global Investments Limited. Kay Yang was listed as on authorized signor on the account.  Yang was required to complete an Account Opening Form and Agreement which was a 60-page document requiring detailed responses from Yang regarding various financial activities. In a section labeled "Source of Funds to be transferred to Equity [Bank] (to include details of Bank and/or custodian holding the assets to be transferred to Equity [Bank]," the response was Kay Yang, 9855 West Hawthorne Road, Mequon, WI 53097. Also, in the Account Profile section, the controlling interest is listed as Kay Yang, Director, with an address of 9855 West Hawthorne Road, Mequon, Wisconsin.

47. A review of account x8580 from October 2019 through January 2021 appears to show this account was used as a holding account for Yang's investment activity. The account received investor deposits totaling approximately $15.1 million and an additional $3 million of proceeds of investment redemptions during this period. The withdrawal activity during the same period identified approximately $14.0 million of the funds were transferred to businesses engaged in trading or investment activities. This account was closed in January 2021 with an ending balance in the account of approximately $3.6 million. Agents have not been able to trace these funds to a new financial account.

48. A review of account x8850 from February 2020 to November 2020 shows this account appears to be an operating account used by Xapphire. The account deposits consisted of investor deposits totaling approximately $1.8 million and $1.7 million proceeds of investment performance/advisory fees. The withdrawals in the account totaled $3.5 million and were as follows:

- $1.6 million – appear to be operating expenses of the business – payments to law firms and consulting businesses.

- $ 852,000 - payments to title companies to purchase real estate.

- $ 614,000 - payments to existing investors.

- $ 350,000 – the transaction was described as a short-term loan to fund a future project.

Based on the above, it appears that, as was the case with account x4123, Yang is using investor funds to pay other investors, to operate her business, and to pay personal expenses.

**Investment/Trading Activity**

49. Yang did engage in legitimate trading activity in foreign currencies. Agents have obtained trading records from foreign financial regulators regarding Yang's trading activity. These records revealed that from May 2017 to January 2021, a total of $12.0 million in funds were sent to trading accounts for the purpose of trading in foreign exchange. A total of $11.0 million of trading

13

losses were incurred in the accounts from forex trading. Below is the detail regarding the trading accounts:

- Records were obtained from CFH Clearing a London based business that executed foreign exchange trading for Yang. A certificate of incorporation was included with the account opening documents for Xapphire G Fund Limited. This entity was incorporated in the Commonwealth of Bahamas on June 27, 2019. Also included in the account opening documents was a Private Placement Memorandum dated August 26, 2019, identifying Yang as the CEO and Founder of Xapphire G Fund Ltd. and Xapphire Global Investments Ltd. The records revealed that foreign exchange trading activity occurred during the period January 2020 thru January 2021. A total of four trading accounts were funded with deposits of $7.963 million. The trading activity in these accounts resulted in losses (including fees) of $7.962 million.

- Records were obtained from the United Kingdom Financial Conduct Authority from a financial technology company ("LMAX") that executed foreign exchange trading for Yang. The Corporate Account Application form lists the registered company as Xapphire Fund LLC with an address of 1017 West Glen Oaks Lane, Suite 105, Mequon, Wisconsin. The brokerage activity covered the period April 2019 thru December 2019. The records revealed that Yang deposited approximately $3.0 million into three brokerage accounts for foreign exchange trading. The trading activity in these accounts resulted in losses (including fees) in excess of $2.45 million and $454,743 in withdrawals. In July 2020, Yang produced records in response to a subpoena issued by the Securities and Exchange Commission ("SEC"). Those records included "Brokerage Logs" reportedly from LMAX. Your affiant did a comparison of the monthly profit and loss in the brokerage statements produced by the LMAX to the Brokerage Logs produced by Yang. None of the statements produced by Yang reconciled to the monthly transactions produced by LMAX. For example, the July 2019 statement produced by Yang showed a profit of $182,274.09 yet the LMAX transactions for July 2019 showed a loss of $164,000. It appears the altered Brokerage Logs produced to the SEC were to represent she was making a profit from the trading activity when in fact Yang lost over $2.4 million.

- Records have been received from the Australian Securities and Investments Commission for brokerage account records of AK Global Advising Ltd. Yang is listed as an account manager on the authorized officer application. The corporate application for AK Global Advising Ltd. lists registered office address in Grand Cayman Islands. The records identified one trading account opened for AK Global Advising Ltd for the period August 2017 thru March 2018. During that period, approximately $1.1 million in funds were deposited into the account. The trading activity in the account during this period resulted in a trading loss (including fees) of $609,000.

**Ponzi Scheme Payments**

50. As explained in paragraphs 14-16 above, Ponzi schemes simply take in money from newly invested participants and use those funds to pay the returns promised to earlier participants. Your

14

affiant has reviewed the financial accounts used to make investment return payments to investors. Yang has made approximately $2.5 million of return payments to investors. Based upon review of the financial records, it appears Yang is using new investor funds for these return payments. Examples of "Ponzi" scheme type payments are in the paragraphs below.

51.     On January 25 and 28, 2019, Yang received $1,100,000 from four different investors. The funds were deposited into Capitol One account x4123 in the name of AK Equity Group LLC. Over the next 26 days, these "new" investor funds were never allocated to an investor account or used for investment activities. Instead, these funds were used to make payments of $815,226 to "old" investors.

52.     On February 26, 2019, Yang received $250,000 from four different investors. The funds were deposited into Capital One account x4123 in the name of AK Equity Group LLC. These funds were never deposited into investor accounts or used for investment activities. Instead, Yang made two payments totaling $200,000 to pay an "old" investor. These payments occurred on February 27, 2019, one day after receiving the new investor funds.

53.     On March 25, 26 and 30, 2020, Yang received three wire transfers of $75,000; $75,000; and $25,000. These wire transfers were deposited into Equity Bank and Trust account x8850. The bank statements labeled the transactions as "Wire Transfer In – Funding of the Account [Investor 5 initials] + [initials of Investor 5's spouse]." On April 1, 2020, an outgoing wire transfer of $139,855 was conducted. The transaction is labeled on the account statement as "Wire Transfer Out – Payment of Business Investment – [investor name referenced in the payment]."

**Yang's Use of Investor Funds for Personal Use**

54.     As noted in paragraph 43 above, and elsewhere in this affidavit, it appears that Yang was using investor funds for her personal expenses (e.g., casino expenses, travel, real estate purchases). Some of these expenditures are described in more detail in the paragraphs below.

55.     The AK Equity Capital One bank account x4123 had an excessive number of transactions

15

that occurred at casinos. From September 2017 to July 2019, the account had 248 ATM withdrawals or debit transactions from casinos in Milwaukee, Wisconsin and Las Vegas, Nevada. These transactions totaled over $301,000. On November 7, 2019, Yang was interviewed by Wisconsin Department of Financial Institutions, Division of Securities ("DFI") Attorneys and Securities Examiners. The purpose of the interview was to determine whether Yang was in compliance with Wisconsin laws in the offer and sale of securities. During questioning, Yang was specifically asked about the excessive number of ATM withdrawals and debit card purchases occurring in AK Equity Capital One bank account x4123 at Potawatomi Casino in Milwaukee, Wisconsin. Her response was as follows:

Yang: Yeah, so those are just really withdrawals. That's all it was.

DFI Attorney: Why do you go to the casino to make withdrawals?

Yang: Withdrawals -- because there's no fees. And there's no Capital One around here.

DFI Attorney: You don't gamble over at Potawatomi?

Yang: Sometimes. Not always.

DFI Attorney: Have you ever used investor funds to gamble?

Yang: No. Unless it's my portion of it.

56. Records were received from Potawatomi Casino in Milwaukee, Wisconsin, for the Yangs' casino activity. For the period January 1, 2016, through August 25, 2020, Yang had visited the casino on 327 different days during that period and had put funds of $7.3 million into slot machines. Based on the casino profit and loss report for Yang, Yang lost a total of $569,555 over that period.

57. For the period January 1, 2016, through August 25, 2020, Chao Yang had visited the casino on 314 different days during that period and had put funds of $3.4 million into slot machines. Based on the casino's profit and loss report for Chao Yang, Chao Yang lost a total of $284,687 over that period.

58. In total, the Yangs lost approximately $854,242 at Potawatomi Casino from January 1,

16

2016 thru August 25, 2020.

59.     Yang also transferred funds from the AK Equity Group account x4123 to personal/other bank accounts that she or her husband controlled.  As explained above, Yang transferred $2.6 million from November 2017 to December 2019 to personal accounts she controlled.

60.     The first account used for Yang's personal benefit was account x1209 in the name of AK Equity Group LLC opened at Capital One Bank.  The account was opened on November 3, 2017, and Kay Yang is listed as a signor on the account.  From November 2017 to December 2019, this account was funded with transfers totaling approximately $1,196,000 from AK Equity Group account x4123.   A review of the account identified very few transactions that appear to be legitimate expenses for AK Equity LLC.  The majority of the transactions in this account were personal expenses of Yang and Chao Yang.  These transactions are as follows:

- Approximately $531,000 transferred to personal bank account of Chao Yang at Capital One Bank x9404.

- Approximately $336,000 of ATM withdrawals and debit card payments made to casinos in Las Vegas, Nevada, Atlantic City, New Jersey and Milwaukee, Wisconsin.

- Approximately $110,000 to pay personal credit cards of Chao Yang.

61.     The second account was the personal account of Chao Yang at Capital One Bank x9404.  This account was opened on November 13, 2017, in the name of Chao Yang.  The address on account statements was 9855 West Hawthorne Road, Mequon, Wisconsin, the Yangs' personal residence. From November 2017 to December 2019, this account received $902,000 in transfers from account x4123.   In addition, this account received approximately $531,000 from x1209 (described above) during the period November 2017 to July 2019.  The funds transferred into the account were used to pay personal expenses of the Yangs as follows:

- Approximately $640,000 sent to an international wire transfer business.

- Approximately $250,000 for the purchase of a residence for Yang's sister in Sheboygan, Wisconsin.

17

- Approximately $151,000 to pay personal credit cards of Kay and Chao Yang.

- Approximately $92,000 – ATM withdrawals and debit transactions at casinos in Milwaukee, Wisconsin and Las Vegas, Nevada.

62.     Yang also used investor funds from account x4123 to purchase a personal residence in Mequon, Wisconsin.  On February 27 and February 28, 2018, an investor wired $1.05 million to AK Equity Group, LLC to Capital One Bank account x4123.  On March 2, 2018, four bank transfers were sent from AK Equity Group Capital One Bank account x4123 to Chao and Kay Yang's Associated Bank account x5007 totaling $350,000.  On March 14, 2018, there were three bank transfers from AK Equity Group Capital One Bank account x4123 to Chao and Kay Yang Associated Bank account 5007 totaling $225,000.  On March 22, 2018, a wire in the amount of $534,801.47 was sent to Land Closing Services toward the purchase of the home located 9855 Hawthorne Rd, Mequon, WI.  This is the current residence of Chao and Kay Yang.

63.     In addition, the following transactions below are additional personal expenditures identified in the AK Equity Group Capital One Bank account x4123:

- Approximately $98,000 in payments to Travel Zap, a vacation service provider for the leisure group travel industry.

  - $25,040 - March 1, 2018.

  - $44,066 – April 10, 2018.

  - $15,093 - May 2, 2018.

  - $14,363 – May 17, 2018

- A $54,125 payment to Tesla Motors on June 26, 2018.

- Approximately $26,000 in payments made to Department of Education to payoff student loans.

- Approximately $24,000 in tuition payments made to Columbia College in Chicago.

18

## Other Items

64.     On January 22, 2021, an interview was conducted with individual "AY" who provided website services for Yang.   AY met Yang in late 2016 or early 2017.   Yang initially had AY build websites for her investment businesses. AY stated the following websites were built during the time periods described below:

- AK Equity Group in February or March 2018

- AK Global Investments – Summer or second half 2018

- Xapphire LLC – Middle of 2019

65.     In addition, AY also built a web-based client portal in April 2018 for Yang's clients. The portal allowed Yang's clients to log into a website to review their investment/trading activity.   The data used to populate the investment activity of the portal was provided by Yang.   The data was in an excel or comma separated value (.csv) file format.   AY stated that Yang initially provided the data to AY on a monthly basis.   Yang then changed the frequency to quarterly.   Yang told AY the investment/trading activity was occurring over a longer period so there was no need to provide the data on a monthly basis any longer.   Yang never provided AY with any reports to reconcile the data files.   AY stated Yang controlled all of the data.

66.     Your affiant is aware that it is common practice for data to be "reconciled" after migration into a system.   The reconciliation is a verification that original source data has migrated correctly into the system.   In this case, the original source data would be the trading/investment activity that occurred.   However, Yang never provided any reporting from the original source data to ensure accuracy.   Therefore, the data files provided by Yang could be manipulated or altered.

## Conclusion

67.     Based on the facts set forth above, your affiant submits that probable cause exists to believe Kay Yang has violated Title 18, United States Code, Sections 1956 (money laundering),

19

1957(money laundering), and Title 18, United States Code, Section 1343 (wire fraud), and that evidence of the aforementioned violations can be found at the residence of Yang located at 9855 West Hawthorne Road, Mequon, Wisconsin, and described in detail in Attachment A. Your affiant respectfully requests that search warrants be issued authorizing the search of said premises for items described in Attachment B, which constitute evidence, fruits, and instrumentalities of the criminal offenses described above.

# ATTACHMENT A

Description of:      Kay Yang Residence
                     9855 West Hawthorne Road
                     Mequon, Wisconsin 53097

      This is a personal residence located just south of West Hawthorne Road on a private driveway. The residence is identified with the numbers "9855" etched in a wooden mailbox post located on West Hawthorne Road. The home is a two-story residence with red brick as the exterior walls. The residence also includes an attached 4 car garage.



# ATTACHMENT B

## ITEMS TO BE SEIZED

1.     All records relating to violations of Title 18, United States Code, Sections, Sections 1343, 1956, 1957, those violations involving Kay Yang, AK Equity Group LLC, AK Global Investing LLC, Xapphire Fund LLC, Xapphire G Fund LLC and Xapphire LLC and occurring after January 1, 2016, including:

a.   ledgers, journals, subsidiary ledgers, financial statements, gross receipts and income records, cash receipts and disbursements records and/or journals, sales and purchase records and/or journals, accounts receivable and payable ledgers and records, bad debt records, cost of goods sold records, loan receivable and payable ledgers, voucher register and all sales and expense invoices including all invoices documenting expenses paid in cash or bank checks and retained copies of any bank checks, and any other handwritten summaries/notes or schedules;

b.   personal and business financial records reflecting income and expenses including: state and federal tax returns, bank statements, records reflecting dates and amounts of deposits, deposit slips, records reflecting dates and amounts of withdrawals, withdrawal slips, debit and credit memos, records reflecting the identity of checks deposited, records disclosing the disposition of withdrawals, check registers, checks and deposit tickets including cash deposits, certificates of deposit, money market certificates,  cancelled checks (front and back), check stubs, money orders and receipts, cashier's checks, travelers checks, wire transfers, records reflecting the transfer of funds, bank notices, trust account records, brokerage account records, signature cards, foreign bank records, and any other records relating to bank accounts;

c.   business origination and creation documents;

d.   titles to assets, real estate records, foreign real estate and other assets, travel and vacation records, IRA and 401K records, stocks and bonds records, insurance records, passbooks, gambling records, trust records, and other investment records;

e.   documents and items evidencing the obtaining, secreting, transfer, and/or concealment of assets and expenditure of money;

f.   records of off-site storage locations, including but not limited to safe deposit boxes, keys and records, and records of storage facilities such as receipts, keys, and rental agreements;

22

g.  client records including names, addresses, notes, transaction records including subsidiary ledgers, schedules, summaries, and other financial statements identifying clients;

h.  personal identification documents;

i.  All cash amounts in excess of $1,500, currency, financial instruments, and

j.  computers or storage media used as a means to commit the violations described above.

2.  For any computer or storage medium the seizure of which is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

23

j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this attachment; and

n.   records in any format or medium that describe or refer to online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

3.   Routers, modems, and network equipment used to connect computers to the Internet.

### Definitions of Key Terms

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

24